UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MONIQUE TRENT,
ADMINISTRATOR OF
THE ESTATE OF
JESSE TRENT,
Deceased,

         Plaintiff,                             Case No.  __3:24cv804__

v.

ANTIONETTE IRVING, Individually,
and as Sheriff, City of Richmond, Virginia,

                    **SERVE:**
                    **Sheriff Antionette Irving**
                    **1701 Fairfield Way**
                    **Richmond, Virginia 23223**
                    **(City of Richmond)**

AND,

JOHN DOE DEFENDANTS 1-20, (Deputies of Defendant
Antoinette Irving, Sheriff, City of Richmond),  Individually,
and as Deputy Sheriffs of the City of Richmond, Virginia,

                    **SERVE ALL AT:**
                    **1701 Fairfield Way**
                    **Richmond, Virginia 23223**
                    **(City of Richmond)**

                    Defendants.

COMPLAINT

Plaintiff, Monique Trent, Administrator of the Estate of Jesse Trent, deceased, by counsel,

moves this Court for judgment against defendants Antionette Irving ("Irving"), individually, and as

policymaker for the operation of the "Richmond City Justice Center," also known as the City of

Richmond Justice Center, ("Jail") and John Doe Defendants ("Defendant Deputies"), and in support

1

of her Complaint, avers the following[1]:

INTRODUCTION

1.      This Complaint asserts claims pursuant to 42 U.S.C. §1983, as well as claims pursuant to Virginia's wrongful death statute (Va. Code §8.01-50), which are properly before the District Court pursuant to 28 U.S.C. §1367(a) regarding supplemental jurisdiction over claims.

2.      On March 28, 2023, Jesse Trent ("Mr. Trent"), became the **fifth** inmate to die at the Jail within one year.

3.      At the time of his untimely death, Mr. Trent had been in Irving's custody since December 28, 2021.

4.      According to Mr. Trent's autopsy, he died from "cocaine toxicity." (A copy of Mr. Trent's autopsy report is attached as Exhibit 1).

5.      At the time of Mr. Trent's death, Irving was responsible for maintaining and operating the Jail, including in a manner that would not endanger the health and safety of the inmates in her custody at the Jail. For the last several years, however, Irving seemingly promoted, or at least permitted an inhumane environment to fester without taking any remedial or mitigating actions.

6.      In apparent response to Irving's ostensible nonchalance concerning the inhumane conditions and rising number of inmate deaths in her Jail, the Board of Local and Regional Jails ("BLRJ") intervened.

7.      Due to Irving's ineptitude, she was required to execute a "Compliance Plan" on November 15, 2023, in which multiple violations of the minimum standards for jails and lockups

---

1 This case is filed in connection with the following cases: T'von Maurice Carter v. Sheriff Antoinette Irving, et. al, 3:24-cv-00293-JAG; Trevelle Winn v. Sheriff Antoinette Irving, et. al, Case No. 3:24cv-00262-JAG; Estate of Steven Carey v. Sheriff Antoinette Irving, et. al, 3:24-cv-00291-JAG; and Estate of Vance D. Holloway v. Sheriff Antoinette Irving, et. al, Case No. 3:24-cv-00709-JAG.

were cited against the Jail. (A copy of the BLRJ Compliance Plan is attached as **Exhibit 2**).

8.   Considering the factual allegations of this case, and the findings of BLRJ, Defendants Irving and Defendant Deputies violated the Eighth amendment of the United States Constitution and statutory duties of care to inmates in their custody, including Mr. Trent, because they failed to protect Mr. Trent, allowed inmates to live in inhumane conditions, and failed to provide for inmate safety and care.

9.   Mr. Trent is survived by his mother, Monique Trent, and two children. In accordance with Virginia's wrongful death statute, these individuals comprise Mr. Trent's "statutory beneficiaries."

## JURISDICTION

10.   Pursuant to 28 U.S.C. §1331, this Court has federal question jurisdiction of Plaintiff's 42 U.S.C. §1983 claims. Furthermore, pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction of Plaintiff's state law claims, including claims pursuant to Virginia Code §8.01-50.

## VENUE

11.   Venue is proper pursuant to 28 U.S.C. §1391(b)(2) inasmuch as a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

12.   Plaintiff, Monique Trent ("Ms. Trent"), a resident of the Commonwealth of Virginia, qualified as the Administrator of the Estate of Jesse Trent, and was appointed by the Circuit Court of the City of Richmond to bring forth this action on June 15, 2023. (A copy of the Certificate of Qualification is attached hereto as **Exhibit 3**).

13.   Growing up, Mr. Trent loved sports, playing football, basketball, and softball.

14.   At the time of his death, thirty-year-old Mr. Trent was a resident of the

3

Commonwealth of Virginia.

15.     When Mr. Trent perished,  he was in the custody of Irving and the City of Richmond

Sheriff's Office ("Sheriff's Office").

16.     At all relevant times, Irving was the elected Sheriff of the City of Richmond.  As

Sheriff of the City of Richmond, Irving is and was at all relevant times a constitutional officer,

independent of the City of Richmond. (All references herein to the "Sheriff's Office" and "jail staff"

are, in fact, alleged against Sheriff Irving, the elected constitutional officer).

17.     As a constitutional officer of the Commonwealth of Virginia, Irving operated,

directed, supervised, and was directly responsible for the Jail,  Jail personnel, the Sheriff's Office,

and all City of Richmond Sheriff's Office deputies, employees, agents, and/or servants in Irving's

employ, including Defendant  Deputies. At all relevant times, Irving had a duty to maintain the

custody and care of all Jail inmates, including Mr. Trent, and otherwise delegated that duty to her

employees, agents, and servants, including Defendant Deputies.

18.     At all relevant times, Defendant Deputies were, upon information and belief,

residents of the Commonwealth of Virginia, and employees, agents, and/or servants of Irving. These

Defendants were on duty and assigned to Mr. Trent's housing unit, or otherwise had responsibilities

related to Mr. Trent and other inmates in his housing pod. These individuals are sued in their

individual capacities.

19.     Pursuant to Virginia Code Section 15.2-1609, Irving was, at all relevant times,

responsible for the custody, feeding, and care of all prisoners confined in the Jail, including Mr.

Trent.

20.     At all relevant times, Irving was responsible for the training and conduct of all jail

employees, including, but not limited to, the Defendant Deputies.

21.     At all relevant times, Irving was responsible for implementing policies regarding inmate care, including, but not limited to security and medical treatment.

22.     At all relevant times, Irving was responsible for appropriately staffing the Jail with a sufficient number of deputies to fulfill her constitutional and statutory duties of care in providing for the custody, feeding, and care of all inmates in the Jail.

23.     At all relevant times, Irving was responsible for ensuring that her policies pertaining to the care and treatment of inmates were adhered to by her employees, agents, and/or servants, including the Defendant Deputies.

24.     At all relevant times, Sheriff Irving was responsible for ensuring that her policies pertaining to the security of the Jail and safety of the inmates committed to her custody were adhered to by her employees, agents, and/or servants, including the Defendant Deputies.

25.     At all relevant times, the Defendant Deputies assigned to Mr. Trent's housing unit on March 28, 2023, were responsible for the care and safety of inmates in their custody, including Mr. Trent.

26.     At all relevant times, the Defendant Deputies had duties to adhere to protocols and policies implemented by Irving, including, but not limited to ensuring medical care was provided to inmates; performing security checks; performing inmate checks; performing unit searches; and, responding as emergency responders to medical emergencies.

27.     All Defendants are persons acting under the color of state law pursuant to 42 U.S.C. §1983.

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

28.     On March 28, 2023, Mr. Trent became the fifth inmate to die in Irving's custody

within one year. Mr. Trent was the fourth inmate to die from drug toxicity[2].

29.     Mr. Trent was committed to the custody of Irving a little over a year before his death, on or about December 28, 2021.

30.     Upon information and belief, Irving and her employees, agents, and/or servants knew, or should have known that Mr. Trent suffered from a history of drug abuse, particularly considering his intake assessment and criminal history.

31.     Upon information and belief, while Mr. Trent was in Irving's custody, there was minimal supervision of inmates, including Mr. Trent, by Irving and the Defendant Deputies.

32.     March 28, 2023, Mr. Trent was playing basketball on his pod when he suddenly collapsed.

33.     Upon information and belief, when Mr. Trent collapsed, none of Irving's employees, agents, and/or servants, including Defendant Deputies were monitoring inmates, including Mr. Trent and others playing basketball.

34.     Upon information and belief, at the time of Mr. Trent's medical emergency, there were no deputies assigned to Mr. Trent's housing unit to monitor the well-being and conduct of inmates, to supervise the inmates, or to provide any emergency response.

35.     Upon information and belief, prior to Mr. Trent's medical emergency, Irving intentionally removed or ordered the removal of deputies from Mr. Trent's housing unit, leaving the inmates without any supervision.

36.     Upon information and belief, prior to Mr. Trent's medical emergency, Irving intentionally removed or ordered the removal of computer technology inside the housing unit from

2 Three of the five other inmates who died between March 2022 and March 2023, died from fentanyl toxicity.

which her deputies previously monitored and controlled each housing unit, securely granting or denying access to the housing unit. As a result, upon information and belief, the inmates in Mr. Trent's housing unit were unsupervised.

37.     Upon information and belief, Irving's actions described in Paragraphs 35 and 36 occurred because her Jail was woefully understaffed.

38.     Upon information and belief, at the time of Mr. Trent's emergency, housing units were only monitored by cameras stationed in "Master Control," if at all.

39.     Upon information and belief, at the time of Mr. Trent's emergency, Irving did not have an emergency system in place which allowed Master Control to prioritize emergency calls, but rather, to respond to calls in the order in which Master Control received them.

40.     Upon information and belief, by the time Defendant Deputies responded to the basketball court where Mr. Trent lay, Mr. Trent was deceased.

41.     Alternatively, upon information and belief, when the Defendant Deputies arrived at the basketball court where Mr. Trent collapsed, they failed to administer any life-saving measures to prevent Mr. Trent's death, including, but not limited to cardiopulmonary resuscitation, or the administration of an automated external defibrillator ("AED").

42.     Upon information and belief, when the Defendant Deputies responded to the basketball court where Mr. Trent collapsed, they did not possess necessary life-saving equipment to appropriately address Mr. Trent's condition.

43.     Wherefore, plaintiff prays for damages as set forth below.

## I.     SHERIFF IRVING KNOWS OF THE JAIL'S INHUMANE CONDITIONS

44.     Of the five jail deaths described herein, three have reportedly been due to drug toxicity.

45.     When confronted with the number of deaths in her jail in 2023, including Mr. Carey's, Irving reportedly admitted such statistic was "alarming[3]."

46.     Yet, when addressing the drug problem in her jail, Irving deflected, "Drugs are an issue in all institutions…not just this institution[4]."

47.     In responding to public criticism regarding an increase in jail violence, jail deaths, and drug abuse, Irving ostensibly attributes the Jail's problems to staffing shortages,[5] for which she is solely responsible. In fact, according to Irving, her staffing shortage is "the worst it's been[6]" since Irving assumed office in 2018.

48.     As Sheriff for the City of Richmond, Irving is responsible for the recruitment, hiring, and retention of employees to properly staff the Jail in a safe and secure manner in order to comply with her constitutional and statutory duties.

49.     Despite Irving's knowledge concerning the dangerous conditions in the Jail,  Irving minimizes how staffing shortages actually promote illegal activities inside the jail, "It is a concern we have, and we're working hard to manage how we operate and how we house individuals to ensure that we can also provide safety for the individuals that are working and living there."

50.     In other words, Irving has done nothing to effectively address the Jail's problems.

---

3 Channel 8 News, *What happened to Steven Carey? 4th inmate found dead in Richmond's jail in a year*, by Autumn Childress, https://www.wric.com/news/local-news/richmond/what-happened-to-steven-carey-4th-inmate-found-dead-in-richmonds-jail-in-a-year/.
4 Channel 8 News, *'How are the drugs getting in there?': Leaders react to fourth Richmond inmate death in a year*, by Autumn Childress, https://www.wric.com/news/local-news/richmond/how-are-the-drugs-getting-in-there-leaders-react-to-fourth-richmond-inmate-death-in-a-year/.
5 In providing an update to Richmond Council's Public Safety Committee on her staffing levels, Sheriff Irving indicated she was down 170 deputies, approximately half of her 385 sworn positions.
6 Channel 6 News, *Richmond leaders 'scared' about mounting staffing shortages at city jail: 'We're in an emergency.'*, by Tyler Layne, *https://www.wtvr.com/news/problem-solvers/problem-solvers-investigations/richmond-leaders-scared-about-mounting-staffing-shortages-at-city-jail-january-24-2023*.

## II.   SHERIFF IRVING AND DEFENDANT DEPUTIES KNOWINGLY OPERATE THE JAIL IN A MANNER THAT VIOLATES INMATES' CONSITUTIONAL RIGHTS.

51.    According to former employees of Irving, the Jail lacks adequate supervision of inmates, "This jail is a mess and out of control[7]."

52.    Addressing the level of morale among deputies, another deputy stated, "Sheriff Irving 'told us in formation that she doesn't need any of us. She stood in front of us and said that she can run that jail by herself."

53.    On January 24, 2023, two months prior to Mr. Trent's death, a former inmate, David Dupree, described the conditions inside the Jail, stating, "The guards were gone the whole time. I was up the whole night. I couldn't sleep, period[8]."

54.    Dupree added that many inmates had access to drugs inside the jail and that 'people were walking around like zombies.'

55.    With respect to deputies performing security checks, Dupree noted, "I felt like they wouldn't do any security checks and they wouldn't provide you with anything."

56.    On December 2, 2022, Irving admitted her office was having difficulty with the safety of inmates within the jail, though noted it was common among other institutions, "We do have challenges with safety and security but not more than any other facility.[9]"

57.    In an interview on January 11, 2023, Irving admitted the challenge of actually

---

7 Richmond Free Press, by Jeremy Lazarus, *Trammel seeks City Jail investigation amid reports of deaths, injuries*, https://richmondfreepress.com/news/2022/nov/23/climate-fear/.
8 Channel 6 News, *Richmond leaders 'scared' about mounting staffing shortages at city jail: 'We're in an emergency.'*, by Tyler Layne, https://www.wtvr.com/news/problem-solvers/problem-solvers-investigations/richmond-leaders-scared-about-mounting-staffing-shortages-at-city-jail-january-24-2023.
9 Channel 6 News, by Tyler Layne, *Richmond Sheriff addresses jail safety challenges as city official calls for state investigation,* https://www.wtvr.com/news/local-news/richmond-sheriff-jail-safety-december-02-2022.

checking pods and cells with limited staff, "It's difficult, but our staff is working really, really hard to do the things that need to be done.[10]"

58.     Despite the mounting number of drug related deaths in the Jail, Irving fails to address the problem with urgency,  "We're doing what we can to catch them[11]."

## III.   BY FAILING TO IMPLEMENT MEASURES NECESSARY TO PREVENT CRIMINAL ACTIVITY, INCLUDING DRUG DISTRIBUTION AND DRUG USE, AMONG PEOPLE WHOSE LIVES ARE IN DEFENDANTS' HANDS, DEFENDANTS EXHIBIT DELIBERATE INDIFFERENCE TO INMATES, INCLUDING MR. CAREY.

59.     For the last two years, Irving's Jail has been publicly scrutinized for violence, drug abuse, and staff shortages.

60.     In May 2021, one former deputy[12] explained his rationale for leaving the office, "The jail became so short-staffed under Sheriff Irving's leadership, I was unable to do my job. I have never felt so scared as towards the end of my time at jail[13]."

61.     In the same article, Irving blamed the Jail's condition on low pay and the social climate, "A lot of this is from COVID, the unrest, the use of force."

62.     A year later, Irving acknowledged worsening conditions in her Jail, "We do have issues at the Sheriff's Office. Yes we do[14]."

---

10 Channel 6 News, by Tyler Layne, *With 3 inmates dead at Richmond Jail in 3 months, sheriff addresses drug problems*, https://www.wtvr.com/news/problem-solvers/problem-solvers-investigations/inmate-deaths-richmond-city-jail-january-11-2023.
11 Channel 8 News, by Autumn Childress, *Richmond Sheriff responds to 5 inmate deaths, calls jail operations 'pretty good,'* https://www.wric.com/news/taking-action/richmond-sheriff-responds-to-5-inmate-deaths-calls-jail-operations-pretty-good/.
12 According to former Lieutenant Juan Meja, "The jail is out of control right now." Another former employee added, "She has let the jail become almost like a playground."
13 Channel 8 News, by Kerri O'Brien, *'The inmates start running the jail,' Richmond jail short 110 deputies, some raise safety concerns*, https://www.wric.com/news/local-news/richmond/the-inmates-start-running-the-jail-richmond-jail-short-110-deputies-some-raise-safety-concerns/.
14 Channel 6 News, by Jake Burns, *Sheriff addresses alleged safety concerns for deputies at*

63.     Notwithstanding inhumane conditions,  Irving admitted she did not possess the gumption to remedy the conditions at the Jail, "I'm not looking for excuses; I'm looking for solutions. Getting people to come to work. Making sure people are trained. That's what I'm looking for. Getting people the mental health treatment that they need."

64.     Despite rosy-colored sound bites, Irving and Defendant Deputies were deliberately indifferent to Mr. Trent's needs.

65.     Specifically, upon information and belief, at the time of Mr. Trent's death, Irving's employees, agents, and/or servants, including Defendant Deputies, were not performing security checks as required[15.]

66.     Upon information and belief, at the time of Mr. Trent's death, Irving's employees, agents, and/or servants, including Defendant Deputies, were falsifying records[16] to reflect they performed security checks per minimum standards when, in reality, they failed to perform security checks.

67.     Upon information and belief, at the time of Mr. Trent's death, Irving's employees, agents, and/or servants, including Defendant Deputies, were not checking or searching jail cells, inmates, or deputies for illegal contraband, including illegal drugs.

68.     Upon information and belief, at the time of Mr. Trent's death, neither Irving nor her

---

*Richmond City Jail: 'I'm looking for solutions,'* https://www.wtvr.com/news/local-news/richmond-sheriff-addresses-safety-concerns-richmond-city-jail-july-26-2022.

[15] This allegation was confirmed by the BLRJ Compliance Plan dated November 15, 2023. When asked about the deputies' ability to monitor the inmates, one deputy stated, "There is just too much going on, and we just have too few people to handle the situations we face and do the rounds." Richmond Free Press, *State Jails Board creates improvement plan for City Jail*, by Jeremy Lazarus, https://richmondfreepress.com/news/2023/dec/14/state-jails-board-creates-improvement-plan-city-ja/

[16] This was also confirmed in the BLRJ Compliance Plan.

employees, agents, and/or servants, including Defendant Deputies, were preventing[17] illegal drugs from entering the Jail.

69.     Upon information and belief, at the time of Mr. Trent's death,  neither Irving nor her employees, agents, and/or servants, including Defendant Deputies, were taking any active measures to prevent inmates from using illegal drugs, including fentanyl.

70.     Upon information and belief, at the time of Mr. Trent's death, Irving's employees, agents, and/or servants, including Defendant Deputies, were not complying with Standard Operating Procedures set forth by Irving, or the Minimum Standards for Local and Regional Jails set forth in the Virginia Code.

71.     Upon information and belief, at the time of Mr. Trent's death, Irving's employees, agents, and/or servants, including Defendant Deputies, were not physically manning the unit in which Mr. Trent.

72.     Upon information and belief, at the time of Mr. Trent's death, Irving's employees, agents, and/or servants, including Defendant Deputies were only monitoring inmate activity through cameras within Master Control, if at all.

73.     Upon information and belief, when Mr. Trent collapsed, Irving's employees, agents, and/or servants, including Defendant Deputies were absent from the unit because of the known staffing shortages.

74.     Upon information and belief, when Mr. Trent collapsed, Irving's employees, agents,

---

17 Prior to the BLRJ's findings, Irving stated that drugs come through "the front door of the back door," of the Jail but claimed her deputies were conducting two pod checks an hour and continuing to monitor inmate jail. Channel 8 News, *'How are the drugs getting in there?': Leaders react to fourth Richmond inmate death in a year*, by Autumn Childress, https://www.wric.com/news/local-news/richmond/how-are-the-drugs-getting-in-there-leaders-react-to-fourth-richmond-inmate-death-in-a-year/.

and/or servants, including Defendant Deputies, were delayed in their emergency response because they were responding from outside the unit.

75.    Upon information and belief, when Mr. Trent collapsed, Irving was not ensuring her deputies complied with Standard Operating Procedures, if any, relating to the security of the Jail, including the prevention of drugs entering the Jail, or the medical condition, security, and well-being of inmates in her custody.

76.    In failing to implement necessary measures to protect inmates, including Mr. Trent, and ensuring that proper operating procedures were followed, particularly considering heightened public scrutiny,  Irving acted with deliberate indifference to the safety of all inmates in her custody, including Mr. Trent.

## COUNT ONE-42 U.S.C. §1983 EIGHTH AMENDMENT FAILURE TO PROTECT AGAINST DEFENDANT IRVING

77.    The foregoing paragraphs are incorporated herein as if set forth fully herein.

78.    At all relevant times, Mr. Trent was incarcerated at the Jail in the custody and care of Irving, whose duty was to protect inmates in her custody.

79.    In fact, the Eighth Amendment of the United States Constitution imposes a duty on jail officials, including Irving, to take reasonable measures to guarantee the safety of inmates[18].

80.    Notwithstanding Irving's duty, Mr. Trent was incarcerated under conditions posing to him and others a substantial risk of serious harm from the ubiquitous presence of  drugs in the Jail, and a grossly insufficient number of deputies to adequately monitor inmates.

81.    Specifically, from March 2022 until March 2023, five inmates, including Mr. Trent,

---

[18] "When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." Deshaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 109 S. Ct. 998 (1989).

perished from drug toxicity.

82.   From 2021 until 2024, job vacancies in Irving's Jail rose from 110 to 191, or 49.4% of 386 deputies.

83.   At the time of Mr. Trent's death, Irving knew that she could not fulfill her duty  to take reasonable measures to guarantee the safety of inmates at the Jail, including Mr. Trent, due to understaffing. To illustrate:

- In 2021, Irving revealed in a City Public Safety Meeting that the Richmond jail was down 110 deputies.

- On July 28, 2022, Irving indicated she had 160 vacant deputy positions, and the jail would be safer if she could just fill 80 of those positions[19].

- On December 2, 2022, Irving told Channel 6 News that the Jail had problems with safety and security.

- In the same article, Irving was quoted as saying, "It's just tough, especially since 2020. It's a different eyesight on doing this type of work. It's tiresome. It's frustrating. It's overwhelming. The lack of respect--we are not looked at the same way we used to be looked at."

- On February 2, 2023, Irving told City Council's Public Safety Committee, "I wish I could hire 100 more people[20]."

---

19 Richmond Free Press, *Richmond sheriff blames staffing challenges for city jail's violence*, https://richmondfreepress.com/news/2022/jul/28/richmond-sheriff-blames-staffing-challenges-city-j/.
20 Richmond Free Press, *City jail deputy shortage continues*, by Jeremy Lazarus, https://richmondfreepress.com/news/2023/feb/02/city-jail-deputy-shortages-continue/.

84.     At the time of Mr. Trent's death, Irving knew that she could not fulfill her duty to take reasonable measures to guarantee the safety of inmates at the Jail, including Mr. Trent, due to the Jail's drug[21] problem.

- In December 2022, Irving stated that her deputies gave Narcan to inmates even if there was no indication for overdose.

- On January 12, 2023, Irving stated, "Drugs are an issue in all institutions…not just this institution."

- When confronted with the rising death toll in her jail, Irving described it as "alarming."

- On April 4, 2023, Irving stated, "Drugs get inside the facility in a lot of ways. Someone could be bringing them in, inmates bringing them in putting them in their body parts."

85.     Despite Irving's knowledge concerning an insufficient number of staff necessary to safely operate the Jail, an ongoing fentanyl problem within her jail, and multiple drug-related deaths due to fentanyl, Irving failed to do anything[22] to adequately address the conditions, illustrating deliberate indifference to a serious risk of substantial harm to inmates, including Mr. Trent, who suffered from substance abuse.

86.     In particular, Irving failed to adequately staff[23] the Jail with a sufficient number of

---

[21] "According to the Bureau of Justice Statistics, incarcerated individuals are about 12 times more likely to exhibit drug dependence or misuse than the general population." Zakora v. Chrisman, 44 F. 4th 452 (6th Cir. 2022).

[22] When confronted about the Jail's condition, Irvin consistently deflected, asserting that her problems stemmed from deputy vacancies (for which she ostensibly did nothing to remedy), low pay, and the social climate.

[23] "Shifts that once had 40 deputies before she took office in 2018 can muster only 10 or 12 deputies

deputies necessary to carry out Irving's duty of care to inmates.

87.     Furthermore, prior to Mr. Trent's death, Irving, upon information and belief, removed deputies from Mr. Trent's housing pod, allowing inmates to freely engage in any type of conduct they saw fit.

88.     Moreover, upon information and belief, three other inmates died from drug toxicity in the same year as Mr. Trent's death.

89.     Equally significant, prior to Mr. Trent's death, Irving, upon information and belief, removed monitoring equipment from Mr. Trent's housing pod, which was previously used by deputies to control inmate movement, and prevent illegal conduct.

90.     Irving's failure to adequately staff the Jail and intentional removal of staff and monitoring equipment from housing pods, constitutes deliberate indifference to the vulnerable state of all inmates in Irving's custody, particularly in an environment with a pervasive drug problem.

91.     By removing staff and technology formerly utilized to control inmates and inmate movement, Irving knew, or should have known that injuries and/or death would occur without proper safety measures in place to prevent such occurrences.

92.     Irving's actions and inactions constitute a violation of Mr. Trent's constitutional rights under 42 U.S.C. §1983, and under the Eighth Amendment of the United States Constitution to be free from cruel and unusual punishment, resulting in Mr. Trent's death.

93.     WHEREFORE, Plaintiff prays for damages as set forth below.

### COUNT TWO-42 USC §1983 SUPERVISORY LIABILITY
### (AS TO DEFENDANT IRVING)

---

to monitor cameras and patrol the cellblocks or pods that are on all six floors of the building--leaving inmates largely to police themselves." Richmond Free Press, *Richmond sheriff blames staffing challenges for city jail's violence*, https://richmondfreepress.com/news/2022/jul/28/richmond-sheriff-blames-staffing-challenges-city-j/.

94.     The foregoing paragraphs are incorporated herein as if set forth fully herein.

95.     At all relevant times, Irving knew of and/or tacitly approved a policy or custom of omitting cell checks and falsifying records in violation of the American Correctional Association Standards as well as Virginia's Administrative Code setting forth minimum standards for jails.

96.     As previously articulated, Irving knew the Jail had a significant drug problem as evidenced by multiple drug-related deaths.

97.     Furthermore, Irving knew the Jail was grossly understaffed.

98.     Considering the insufficient number of staff necessary to safely operate the Jail, Irving knew, or should have known that her employees, agents, and/or servants, including Defendant Deputies,  were not performing cell checks every two hours as required[24].

99.     In fact, upon information and belief, Irving intentionally removed jail staff from Mr. Carey's pod, as well as the equipment formerly utilized to control inmate movement, due to staffing shortages.

100.    The failure to Irving's employees, agents, and/or servants to monitor inmates every two hours as required  posed a pervasive[25] and unreasonable risk of constitutional injury to Mr. Trent inasmuch as there was no one monitoring and/or controlling the conduct of inmates on Mr. Trent's pod, exposing them to serious injury and/or death.

_____

24 In response to a media inquiry on January 11, 2023, Irving stated, "We're doing our twice-an-hour checks as we are responsible for throughout the regulations." In the BLRJ Compliance Plan, however, the BLRJ found violations of BLRJ standard 6 VAC 15-40-1045, which regulation requires security inspections twice per hour at random intervals…" When confronted, Irving stated, "My only comments are that the timings--there were some discrepancies with times, and we're working to ensure there are no longer discrepancies in time."
25 This conduct occurred on at least three occasions as evidenced by the BLRJ's compliance plan, which resulted from the investigation of three RCJC jail deaths on November 14, 2022, December 12, 2022, and January 11, 2023, respectively.

101.     Despite Irving's knowledge of these policies or customs of omitting cell checks and falsifying records, Irving failed to take any corrective action[26]. In fact, Irving's "response[27]" if there was one, was so inadequate as to show deliberate indifference or tacit authorization of the offensive practices.

102.     But for Irving's failure to ensure that deputies in her command were monitoring inmate behavior from a command center within the pods and/or performing security checks every two hours, Mr. Trent's death would not have occurred.

103.     WHEREFORE, Plaintiff prays for damages as set forth below.

## COUNT THREE--42 USC §1983--OFFICIAL POLICY OR CUSTOM REGARDING OPERATION OF JAIL AND TRAINING
### (AS TO DEFENDANT IRVING)

104.     Plaintiff incorporates paragraphs 1-107 as if set forth fully herein.

105.     This claim against Irving is brought in her individual capacity and asserts liability against her based on her actions and/or omissions as the final policymaker for RCJC and its operation. (See Va. Code §15.2-1609, Va. Code 52.1-116.2,  and May v. Newhart, 822 F. Supp. 1233 (E.D. Va. 1993).

106.     Pursuant to the Virginia Code, Irving was at all relevant times the decision and policy maker for the operations and care of inmates at the Jail.

107.     Through her actions and inactions, Irving, while acting under the color of state law pursuant to an official policy or custom, operated and maintained the Jail and trained her deputies, including Defendant Deputies, employees, agents, and/or servants in a manner that posed a risk to

---

26 Irving did not take any corrective action until the BLRJ required her to execute a compliance plan on November 15, 2023, ten months after Mr. Trent's death.
27 When confronted with the Jail's problems, Irving repeatedly minimized the issue, essentially claiming she and her staff were doing what they could.

the health and safety of the inmates, including failing to operate the facility and train the staff to properly care for and protect the inmates from drug abuse inside the jail, and failing to provide adequate medical care to inmates suffering with drug addiction.

108.    At all relevant times, Irving knew of the constitutionally inadequate operations and training at the jail and engaged in an official policy or custom representing a deliberate indifference towards the inmates, including Mr. Trent.

109.    The policy or custom was manifest in certain affirmative actions and omissions by Irving, as well as by a persistent and widespread practice of deliberate indifference to the needs of the inmates sufficient to constitute an official custom. The policy or custom may be inferred from Irving's understaffing of the Jail and subsequent removal of staff from housing pods, as well as the removal of monitoring equipment necessary to maintain order of inmates.

110.    The policy or custom may be inferred from Irving's failure to act despite a known pattern of constitutional deprivations that have occurred within the Jail because of the widespread availability of fentanyl, understaffing, and the lack of proper operations and training to prevent illegal drugs from entering the Jail.

111.    The policy or custom may be inferred from Irving's failure to remedy the Jail's condition that, left unaddressed, was likely to cause, and did in the case of Mr. Carey cause, constitutional deprivations to inmates to whom Irving owed affirmative duties of care.

112.    Irving also had the authority under Virginia law to report overcrowding, and/or understaffing and other inadequacies of the Jail that would warrant the Circuit Court adopting another jail for Richmond. See Va. Code § 53.1-71. Upon information and belief, Irving failed to use statutory authority available to her in the face of known understaffing, and other inhumane conditions, including the unchecked influx of illegal drugs causing inmates to die.

19

113.     The official policy and custom reflected a deliberate indifference to and has resulted in a deprivation of Mr. Trent's constitutional rights under the Eighth and Fourteenth Amendments, and/or other statutory rights, and such policy or custom caused, or contributed to cause Mr. Trent's death.

114.     Irving's policies or customs, including indifference to the training, discipline, supervision, or express direction of Defendant Deputies, and other employees, agents, and/or servants caused or contributed to such deprivations. As stated herein, Irving's policies or customs were directly related to, and the moving force behind, the violation of Mr. Trent's constitutional rights by those of Irving's deputies, employees, and agents, including the Defendant Deputies.

WHERFORE, Defendant's violations of the Eighth and Fourteenth Amendments to the United States Constitution establish a cause of action, pursuant to 42 U.S.C. §1983, for monetary relief consisting of compensatory damages in an amount to be established at trial, and attorney's fees and costs to the Estate.

## COUNT FOUR- GROSS NEGLIGENCE
### (AS TO DEFENDANT IRVING AND DEFENDANT DEPUTIES)

115.     The allegations previously alleged are incorporated herein as if set forth fully herein.

116.     Irving's duties to inmates in her custody, including Mr. Trent, are prescribed in Virginia statutes and Virginia's Administrative Code.

117.     Irving is responsible for daily operations and maintenance at RCJC as the "keeper of the jail." See Va. Code 53.1-116.2.

123.     At all relevant times, Irving had the duty to feed, clothe, and provide medicine to inmates in her custody. See Va. Code. § 53.1-126.

118.     At all relevant times, Irving had the duty to provide and shall not withhold medical

treatment for any communicable diseases, serious medical needs, or life-threatening conditions. See Va. Code §53.1-126.

119.    At all relevant times, Irving had the duty to report that RCJC is insecure so that the Court can command the governing body to cause the Jail to be made secure. See. Va. Code §53.1-57.1.

120.    At all relevant times, Irving and Defendant Deputies had the duty to provide custody, feeding, and care of all prisoners confined in RCJC (Va. Code §15.2-1609), including Mr. Carey, by, among other things, properly screening inmates for substance abuse; searching cells for illegal contraband, including narcotics; searching inmates for illegal contraband, including narcotics; searching deputies, employees, agents, and/or servants of Irving for illegal contraband, including narcotics;  searching private contractors entering preventing drug use by inmates incarcerated; providing sufficient assistance to inmates struggling with addiction; and, providing immediate medical assistance to inmates suffering from medical emergencies, including drug overdoses.

121.    At all relevant times, Irving and Defendant Deputies had a duty to identify inmates at risk for drug abuse; to closely monitor inmates at risk for drug use; and to report any changes in the inmates' condition to supervisors and medical staff responsible for medical and mental health care of inmates.

122.    At all relevant times, Irving had the duty to appoint a sufficient number of deputies necessary to operate the RCJC. See Va. Code §15.2-1609.1.

123.    At all relevant times, Irving had a duty to comply with Chapter 40 of Virginia's Administrative Code, titled "Minimum Standards for Jails and Lockups."

124.    Pursuant to 6VAC15-40-20, Defendant Irving had the "primary responsibility" for application of the minimum standards.

21

125.    Specific to this case, the minimum standards for which Irving had primary responsibility are:

      (A)    Twenty-four-hour emergency medical care (6VAC15-40-360);

      (B)    Medical screening for inmates, including inquiry into past and present drug and alcohol abuse and mental health status (6VAC15-40-370);

      (C)    Training and competency of staff in rendering first aid and CPR (6VAC15-40-390);

      (D)    Training of security staff in the operation of an Automated External Defibrillator (AED)(6VAC15-40-405);

      (E)    Searches of facility and inmates to control contraband (6VAC15-40-910);

      (F)    A policy regarding the control of contraband (6VAC15-40-920);

      (G)    Twenty-four-hour supervision of all inmates by trained personnel (6VAC15-40-1040);

      (H)    Inspecting all inmate housing areas a minimum of twice per hour, which shall be documented (6VAC15-40-1045 and 6VAC15-40-1315).

126.    At all relevant times, Irving and her employees, agents, and servants had a duty to conduct themselves without gross negligence and with due regard for the safety of others, including Mr. Carey.

127.    Notwithstanding their duties, defendants showed indifference to Mr. Trent that constitutes an utter disregard of prudence amounting to a complete neglect of the safety of Mr. Trent.

128.    In particular, but not limited to the following, Irving and the Defendant Deputies were grossly negligent in that they:

      a.    Failed to appropriately attend to Mr. Trent's mental health and medical needs;

22

b.      Failed to properly monitor inmates, including Mr. Trent, for drug use;

c.      Failed to adequately search inmates confined in Mr. Trent's housing unit for illegal narcotics;

d.      Failed to adequately search Mr. Trent and other inmates for illegal narcotics

e.      Failed to adequately search Sheriff's deputies and private contractors for illegal narcotics before they came into contact with inmates, including Mr. Trent;

f.      Failed to prevent Mr. Trent from obtaining illegal drugs inside the jail;

g.      Failed to prevent illegal narcotics from entering the jail when they knew[28] drug use in the jail was rampant;

h.      Failed to implement population control measures that would maintain proper inmate to deputy ratio[29], contributing to illegal drugs entering the Jail;

i.      Failed to implement proper housing relocation to help consolidate inmates in a specific area within the Jail in order to maximize the efforts of Sheriff's deputies in preventing illegal conduct from occurring, including illegal drug use;

---

[28] In a news article titled *What happened to Steven Carey? 4th inmate found dead in Richmond's jail in a year*, Sheriff Irving admitted there was a drug problem in her jail, "Drugs are an issue in all institutions…not just this institution. I've been in this business 30 years and it has been an issue and problem with continue to be."  Quoted in a news article titled, *"Richmond Sheriff responds to 5 inmate deaths, calls jail operations 'pretty good,'"* Sheriff Irving opined, "Drugs get inside the facility in a lot of ways. Someone could be bringing them in, inmates bringing them in putting them in their body parts. We're doing what we can to catch them. Every facility has drugs in it—I don't know that there's any facility that doesn't. It's a problem in prisons and jails."

[29] In a news article titled *Richmond leaders 'scared' about mounting staffing shortages at city jail: 'We're in an emergency,'* Sheriff admitted a staffing shortage problem, describing the situation as "the worst it's been" since she first took office in 2018.

      j.     Failed to staff Mr. Trent's housing unit with Sheriff's deputies to appropriately monitor the conduct of inmates, which increased the probability of drug use in the Jail;

      k.     Failed to staff  Mr. Trent's housing unit with Sheriff's deputies, who could adequately respond to medical emergencies, including, but not limited to administering life-saving measures such as cardiopulmonary resuscitation, and requesting immediate medical attention;

      l.     Failed to appropriately perform security checks;

      m.     Failed to request statutorily permitted assistance from the Circuit Court when Irving knew that the Jail was grossly understaffed, causing a substantial risk of harm to inmates, including Mr. Trent.

129.    Individually, and collectively, the acts specified in the previous Paragraph clearly demonstrate gross negligence by defendants and shock the conscience according to generally accepted standards of decency and morality.

130.    All of the warnings for Mr. Trent's likely exposure to drugs were apparent to defendants as specified above, but in their actions and inactions, defendants' willful and wanton indifference to plaintiff's decedent constitutes an utter disregard of caution amounting to a complete and gross neglect of the safety of plaintiff's decedent.

131.    As a result of the defendants' grossly negligent conduct, Mr. Trent perished.

132.    As a direct and proximate cause of the grossly negligent actions and omissions of the defendants, which contributed to, and were the cause of, Mr. Trent's death, the surviving beneficiaries of Mr. Trent have suffered, and will continue to suffer, sorrow, mental anguish, and the loss of decedent's society, companionship, comfort, guidance, kindly offices, and advice of their

mother, as well as economic losses, as well as funeral expenses.

133.    Wherefore, plaintiff prays for damages as set forth fully below.

## COUNT FIVE--WILLFUL AND WANTON NEGLIGENCE
## (AS TO DEFENDANT IRVING)

134.    The allegations previously alleged are incorporated herein as if set forth fully herein.

135.     As alleged,  Irving is responsible for daily operations and maintenance at RCJC as the "keeper of the jail." See Va. Code 53.1-116.2.

136.    At all relevant times, Irving had the duty to sufficiently staff the Jail so that she could fulfill her duty of care to inmates, including Mr. Trent.

137.    At all relevant times, Irving had the duty to prevent illegal drugs from entering her Jail, thereby preventing the foreseeable consequence of drug overdoses, particularly with inmates whose histories included substance abuse.

138.    At the time of Mr. Trent's death, Irving knew she was unable to fulfill her duty of care to inmates as previously articulated herein.

139.    Specifically, Irving knew her grossly understaffed Jail could not sufficiently monitor inmates and/or prevent drugs, including cocaine, from getting into the hands of inmates. In fact, Mr. Trent's death was the fourth death due to drug toxicity within one year.

140.    Notwithstanding her knowledge, Irving failed to take any actions to address the emergency, including, but not limited to requesting the Circuit Court's intervention and transfer of inmates.  seek the Circuit Court's intervention, as permitted in the Virginia Code, to have inmates transferred to other facilities.

141.    Irving's failure to act in the face of a staffing and drug crisis amounts to willful and wanton conduct inasmuch as she acted consciously in disregard for the rights of the inmates, whose

care and control was in Irving's hands.

142.     At the time of Mr. Trent's death, Irving acted with reckless indifference to the consequences to her inmates, including Mr. Trent, inasmuch as she knew her Jail was grossly understaffed, unable to properly monitor inmates in her custody, essentially promoting illegal conduct, including drug abuse among inmates.

143.     At the time of Mr. Trent's death, Irving knew from the existing circumstances and conditions of the Jail that her failure to do anything would probably and did in fact result in the death of inmates, including Mr. Trent.

144.     As a direct and proximate cause of Irving's willful and wanton conduct, which contributed to, and was the cause of Mr. Trent's death, the surviving beneficiaries of Mr. Trent have suffered, and will continue to suffer, sorrow, mental anguish, and the loss of decedent's society, companionship, comfort, guidance, kindly offices, and advice of  Mr. Trent, as well as economic losses, as well as funeral expenses.

145.     Wherefore, plaintiff prays for damages as set forth fully below.


### COUNT SIX—VICARIOUS LIABILITY/RESPONDEAT SUPERIOR (AS TO DEFENDANT IRVING)

146.     The foregoing allegations are realleged as if set forth fully herein.

147.     The grossly negligent acts and/or omissions specified in Paragraph 134 were committed by Irving's employees, agents, and/or servants.

148.     By virtue of the master-servant relationship between Irving and her employees, agents, and servants, including Defendant Deputy John Does 1-20, Sheriff Irving is vicariously liable for the grossly negligent conduct of her employees, agents, and/or servants, including Defendant

Deputy John Does 1-20, pursuant to the doctrine of *respondeat superior*.

149.    Inasmuch as Sheriff Irving was the "keeper of the jail" according to Virginia Code Section 53.1-116.2 at the time of the aforementioned gross negligence, Sheriff Irving is vicariously liable to the Estate of Steven Carey for the sorrow, mental anguish, society, companionship, comfort, guidance, kindly offices, advice of the decedent, loss of income of the decedent, services, protection, care and assistance provided by the decedent, and funeral expenses.

150.    Wherefore, plaintiff prays for damages as set forth fully below.

### COUNT SEVEN—PUNITIVE DAMAGES
### (As to all Defendants)

151.    The foregoing allegations are incorporated as if set forth fully herein.

152.    In undertaking the conduct described above, the Defendants acted in a knowing, intentional, malicious willful and wanton matter, and in conscious disregard for plaintiff's rights.

153.    Because the actions of the defendants amount to a willful and wanton disregard of plaintiffs' rights which have been deprived in a variety of ways, punitive damages should be awarded to plaintiff to punish defendants for their actions, and to serve as an example to prevent others from acting in a similar way. It is necessary and appropriate to punish, make an example of and deter defendants with punitive or exemplary damages for their willful and malicious conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Monique Trent, Administrator of the Estate Jesse Trent,  prays for judgment, jointly and severally, against the defendants in the amount of Five Million Dollars ($5,000,000.00) in compensatory damages, punitive damages in the amount of One Million Dollars ($1,000,000.00) for the federal claims asserted herein, and and Three Hundred Fifty Thousand Dollars ($350,000.00) in connection with the state claims asserted herein, and attorney's fees in

connection with the federal civil rights claims, together with interest thereon, her costs expended, and such further relief as to which she may be entitled herein.  Alternatively, plaintiff seeks leave to amend her Complaint.

**A TRIAL BY JURY IS REQUESTED ON ALL ISSUES JOINED HEREIN.**

**Respectfully submitted,**

**MONIQUE TRENT, AS ADMINISTRATOR
OF THE ESTATE OF JESSE TRENT**

By: _____/s Jesse Baez_____
                Counsel

T. Noel Brooks, Esq. (VSB # 48129)
Jesse Baez, Esq. (VSB # 85986)
Erik Baines, Esq. (VSB # 83618)
Brooks & Baez
9100 Arboretum Parkway, Suite 190
Richmond, Virginia 23236
T: (804) 570-7473
F: (804) 548-4215
jbaez@brooksbaez.com
nbrooks@brooksbaez.com
*ATTORNEYS FOR PLAINTIFF*

28